**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

MAURICE B. STEWART, JR.       *

Plaintiff                *

v                         *       Civil Action No. JFM-14-570

OFFICER DAVIS, et al.       *

Defendants            *
                         ***

**MEMORANDUM**

Defendants Wexford Health Sources, Inc. ("Wexford") and Robustiano Barrera, M.D. (collectively referred to as "Medical Defendants") move for dismissal or summary judgment in the above-captioned civil rights case.[1]  ECF 17.  Defendants Maryland Division of Correction (DOC), referenced as the Department of Public Safety and Correctional Services (DPSCS), Warden Frank B. Bishop, Jr., former Lt. Rodney O. Likin, C.O. II Codey K. Linn, C.O. II Jerry A. Evans, C.O. II Brad M. Brinegar, C.O. II William L. Logsdon, Sgt. Christopher D. Bingaman, Sgt. Brett E. Payton, and Lt. Curran P. McKenzie[2] (collectively referred to as "State Defendants") also  move for dismissal or summary judgment.  ECF 27 & 29. Plaintiff has not opposed either motion.[3]

---

[1] Medical Defendants' motion to seal records (ECF No. 18) shall be denied.

[2] The Clerk shall correct the docket to reflect the proper spelling of defendants' names.

[3] Pursuant to the dictates of *Roseboro v. Garrison*, 528 F.2d 309, 310 (4th Cir. 1975), on July 29, 2014 and November 24, 2014, respectively,  plaintiff was notified that defendants had filed a dispositive motion, the granting of which could result in the dismissal of his action.  ECF 18 & 28. Plaintiff was also informed that he was entitled to file materials in opposition to that motion within seventeen (17) days from the date of that letter and that his failure to file a timely or responsive pleading or to illustrate, by affidavit or the like, a genuine dispute of material fact, could result in the dismissal of his case or in the entry of summary judgment without further notice of the Court. *Id.*

The court finds a hearing in this matter unnecessary. *See* Local Rule 105.6 (D. Md. 2014).  For the reasons stated below, defendants' motions, construed as motions for summary judgment,[4] shall be GRANTED.

## Background

Plaintiff, an inmate currently confined at the Western Correctional Institution ("WCI") filed the instant complaint alleging a plethora of complaints arising during his confinement at WCI.  ECF No. 1.

Plaintiff states that on January 17, 2014, and "a couple of times before" that date, he was sexually assaulted by his cellmate Joyce. *Id.,* p. 2.  Plaintiff states that his claim of assault was investigated by McKenzie and Liken. Plaintiff states that he believed from the beginning that McKenzie and Liken intended to discredit his claim.  McKenzie advised Plaintiff that there was no evidence Plaintiff was sexually assaulted despite Dr. Joubert finding blood in Plaintiff's underwear and on the surface of his anus, as well as cuts on his left hand, which Plaintiff states happened when he attempted to grab the knife out of his attacker's hands. *Id.,* p. 3.

Plaintiff states that McKenzie advised him that no knife was found. Plaintiff advised McKenzie that his attacker had several friends on the tier who could have hidden the knife but McKenzie declined to search other cells. *Id.*, p. 3-4.  Plaintiff also alleges no camera footage was checked. *Id.*, p. 4. Plaintiff asked to file charges against Joyce but was not permitted to do so. *Id.*

After the attack, Plaintiff and Joyce remained on the same tier, where Joyce was able to make death threats against him. *Id.*  Plaintiff notified several officers of the threats. *Id.*, p. 5.  He filed an ARP regarding the incident but it was dismissed as the matter was being investigated by

---

[4] *See* Fed. R. Civ. Proc. 12(d) "[i]f on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."

the Internal Investigation Unit ("IIU").   *Id*. Plaintiff indicates that the filing of the ARP alerted Bishop to the problems he was having, and Bishop failed to take any corrective action to have plaintiff or his attacker transferred to a different area. *Id*.

Plaintiff also claims that on several occasions "over some months" he was placed into Cell 4-B-1, which is an isolation/contingency cell. Staff refused to turn on the water. Plaintiff was dehydrated and needed water to take his medication. The cell was unsanitary, with feces and urine in and on the toilet, but plaintiff had no water and was unable to flush the toilet. *Id.* p. 5-6. Plaintiff states he inhaled the "toxic fumes" from the unsanitary cell "which lead[s]to all types of diseases." *Id*., p. 6. The cell does not have a bed and he was forced to sleep on a concrete floor in the winter and only permitted to wear a t-shirt, underwear, and a pair of socks.  *Id.*  Bishop was aware of the conditions of the cell and permitted plaintiff to remain housed there. *Id*. Plaintiff also states that when food was delivered to the cell, staff directed him to the back of the cell, facing the wall, and then threw the food onto the filthy floor. *Id*.

On February 21, 2014, plaintiff claims he was subjected to excessive force by  Logsdon. Plaintiff states that while returning from the medical department, his legs gave out and he slipped and fell. *Id*. p. 7. Logsdon directed him to get up. When plaintiff told him he could not stand and requested medical help, Logsdon and Brineger grabbed plaintiff by his arms and dragged him into his cell.  *Id*. He states that Logsdon called him "a bunch of niggers" and Brinegar said that he "should beat [plaintiff's] ass."  Once they dragged plaintiff into his cell they beat, punched, and kicked plaintiff in the face, head, chest, stomach and back. *Id*. Plaintiff states that Logsdon put his foot on plaintiff's face while calling him nigger.  Plaintiff believes the security cameras would show him being dragged into his cell.  *Id*.  Plaintiff alleges Logsdon and Brineger beat him because they believed he was faking his illness or that he did not have cancer and a disk

bulge which causes weakness in his legs. *Id.*, p. 8.  Plaintiff claims that his face was "split" and the back of his head bleeding as a result of Logsdon kicking him.  *Id.*  Plaintiff states that after the assault unnamed officers looked into his cell and saw that he needed medical attention but he never received any and was left on the floor bleeding until the 4 to 12 shift. *Id.*, p. 8.

Plaintiff alleges that Payton, the officer in charge of the unit on that date, allowed the officers to beat him and that  Payton conspired with other unnamed officers to torture inmates in the contingency cell and to steal inmates' meals. *Id.*, p. 7.

Plaintiff also alleges that Lin came on the tier and shouted that if anyone wanted to kill plaintiff they could do so during the next shower time. Later, Lin could be heard propositioning Joyce, offering him an opportunity to "slip his cuffs" in order to kill plaintiff.  The following day, Officer Evans was seen escorting Joyce off the tier. Plaintiff states that officers gave Joyce a shank and showed him how to slip the handcuffs, telling  Joyce they would mace plaintiff in order to blind him while Joyce attacked him. He states that the officer instructed Joyce to make sure he stabbed plaintiff in the neck in order to sever his jugular vein. *Id.*, p. 9-10.

Plaintiff alleges that the foregoing events are why medical staff refuse to admit him to the infirmary.  *Id.*, p. 10. Plaintiff claims that he has repeatedly told health care providers that he cannot properly function in his cell due to the pain in his spine and testicles caused by cancer. He states that at times he cannot move to get off of his bunk in order to use the toilet, which results in his urinating and defecating on himself. Plaintiff's pain  impeded his ability to receive his medication and food at the food slot.    *Id.*, p. 10. Plaintiff was told by Dr. Barrera that he would admit plaintiff to  the infirmary but Barrera never followed through. *Id.*  Plaintiff claims that medical staff refused to admit him to the infirmary because they are conspiring with correctional staff to have him murdered by another inmate. *Id.*, p. 11.

Additionally, plaintiff claims that he is not receiving the appropriate cancer treatments. He states that he should be receiving chemotherapy, radiation, and tumor imaging such as PET, CT and MRIs, but has not received anything. *Id.*

Defendants offer the following information:

A.  Sexual Assault

On January 24, 2014, McKenzie reported to IIU plaintiff's allegation that he was sexually assaulted by his cellmate, Shawn Joyce.  ECF 27, Ex, 1, pp. 1, 6, 10-11, 17-21.  Plaintiff reported to Dr. Joubert he had been sexually assaulted by his cellmate on January 17, 2014, and again within the last two nights. *Id.*, pp. 17-21, 55-56. He reported he was vulnerable to the attack because had had just returned to his cell from the hospital, having undergone a procedure the week before. *Id.* Joubert observed blood around plaintiff's anus and blood on his underwear. *Id.*

Plaintiff was transported to Western Maryland Regional Medical Center (WMRMC) but he refused to have the Sexual Assault Forensic Medical Examination (SAFE) completed. *Id.*, pp. 1, 5-6, 34-43, 52.  Debi Wolford, Forensic Nurse Examiner at WMRMC,  reported that plaintiff stated that Joyce made up stories about homosexuality, "zapped out", and threatened to beat up plaintiff.  Plaintiff also told Wolford he was vulnerable as he had just returned from the hospital after having sutures removed from his back.  Plaintiff stated that he "hollered for one (1) hour" until Joyce pulled out  a rusty knife which plaintiff tried to grab, cutting his fingers. *Id.* Wolford observed superficial avulsions on the tips of the first  and second fingers of plaintiff's left hand. Plaintiff complained of anal pain and anal bleeding but Wolford did not observe any injury. McKenzie spoke with Wolford on the  evening of January 24, 2014. Wolford reported that plaintiff would not allow her or the attending physician to complete the SAFE exam. *Id.*

As a result of plaintiff's allegations, a cell search was conducted and photographs taken of plaintiff's cell.  *Id.*, p. 5, 12-15, 24-31, 57-65.  No weapon was recovered and no signs of struggle were observed. *Id.*

McKenzie interviewed plaintiff, who reported he was anally penetrated during the first assault, which he stated occurred on January 17, 2014. He advised that he did not report the assault because he was afraid. *Id.*, pp. 6-7. Plaintiff had injuries to the fingertips of his first and second fingers on his left hand which he claimed were sustained when he attempted to grab the knife Joyce held to plaintiff's face during the assault.  Plaintiff also claimed  he was sexually assaulted twice after midnight on January 25, 2014 and again that morning.  *Id.* Plaintiff stated that after the assault  Joyce cleaned himself and washed his clothes by hand in the sink. *Id.*, p. 6-7.

McKenzie interviewed Joubert, who stated she did not examine plaintiff until 1:00 p.m. and found blood in his underwear. *Id.*, p. 8.   Plaintiff did not tell Joubert that his attacker had a weapon. He did state that he was unable to defend himself because of the sutures from his recent medical procedure.  Joubert found no signs of trauma, no bruising or signs of tearing, and no other marks on plaintiff. *Id.*

McKenzie also interviewed Joyce, who reported that he and the plaintiff got into an argument around 7:00 or 8:00 p.m on January 23, 2014, "over a whole lot of nothing."  He denied sexually assaulting plaintiff and said he did not know why plaintiff would accuse him of doing so. *Id.*, p. 9. Joyce reported wearing the same clothes since Tuesday, January 21, 2014, and denied washing his clothes in the sink that day. *Id.* Joyce offered that he heard plaintiff had problems with cellmates mentioning things about homosexuality. *Id.*

A search of the cell did not show signs of a struggle. *Id*., p. 8. Review of the interior tape for plaintiff's housing unit on January 17, 2014, was inconclusive as the alleged assault took place inside of the cell. *Id*., pp. 10, 45.

McKenzie advised plaintiff on February 21, 2014, that the assault had been investigated, was unsubstantiated,  and therefore no criminal charges would be filed. *Id*. p. 11.

B.   Threats of harm

Gordon, plaintiff's housing unit manager, avers that inmates confined to HU 4 are confined to their cells 23 hours a day and have contact only with their cell partners.  Movements out of the cell require inmates to be cuffed and escorted by at least one officer.  After plaintiff's allegation that Joyce assaulted him, plaintiff and Joyce were housed in separate cells on separate ends of the tier.  Gordon avers that plaintiff did not report to him or, to his knowledge to any other staff member, that he received threats from Joyce or any other inmates housed on HU4. *Id*., Ex. 2.

C.  Cell conditions

Plaintiff was housed in staff alert cell #4-B-1 from January 3-5, 2014, due to plaintiff's having refused housing and his non-compliance during a strip search. *Id*., Ex. 2. Plaintiff was not housed in a staff alert cell at any other time during 2014.  *Id*., Ex 2, Ex. 3, Ex. 4, Ex. 5.

Payton was not responsible for placing inmates on staff alert status.   He could recommend placement on staff alert, but the recommendation had to be approved by a lieutenant. Payton denies ever directing staff,  or witnessing staff under his supervision, withhold meals from inmates placed on staff alert. *Id*., Ex. 10

D.  Conspiracy/Harassment

Linn and Evans aver that they did not conspire with Joyce or any other inmate to cause

injury to plaintiff.  *Id*., Exs. 6 & 7. Linn  denies yelling on the tier that any inmate who wanted to kill plaintiff could do so the following day. *Id*., Ex. 6. Evans denies providing Joyce a weapon or showing him how to slip his handcuffs. *Id*., Ex. 7.

E.   February 21, 2014 assault

Logsdon avers that he did not racially discriminate against plaintiff. *Id*., Ex. 8.  Brineger avers he never said to plaintiff, "I should beat your ass."  *Id*., Ex. 9. Logsdon and Brineger deny assaulting plaintiff or witnessing any other staff assault plaintiff. *Id*., Exs. 8 & 9. Payton confirms that he did not observe Logsdon or Brineger assault plaintiff and that plaintiff did not report any assault to him. *Id*., Ex. 10.

There are no records of plaintiff being assaulted on February 21, 2014.  No IIU investigation was undertaken for an assault on February 21, 2014. *Id*., Ex. 11. As no use of force or serious incidents were logged for February 21, 2014, the tier tapes were not preserved as the videotape is recorded over every 30 days. *Id*., Ex. 12.

**Standard of Review**

Summary judgment is governed by Fed. R. Civ. P. 56(a) which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion: "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc*., 477 U. S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc*., 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)).  The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 644-45 (4th Cir. 2002).  The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial."  *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

## Analysis

### A.  Failure to Protect

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment.  *Gregg v. Georgia*, 428 U.S. 153, 173 (1976).  "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment."  *De'Lonta v. Angelone,* 330 F. 3d 630, 633 (4th Cir. 2003) citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991).   An inmate has an Eighth Amendment right to be protected from violence perpetrated by other prisoners. *Danser v. Stansberry*, 772 F.3d 340, 346 (4th Cir. 2014); *see Farmer v. Brennan*, 511 U.S. 825, 833-35 (1994). In *Danser*, the Fourth Circuit recently explained:

> This constitutional right derives from the Supreme Court's holdings that the treatment an inmate receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment. [*Farmer*, 511 U.S.] at 832-33. Because being assaulted in prison is not "'part of the penalty that

criminal offenders pay for their offenses against society,'" *id*. at 834 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)), prison officials are responsible for "protect[ing] prisoners from violence at the hands of other prisoners." *Id* at 833 (citations and internal quotation marks omitted).

*Id*. at 346.

Further, the *Danser* Court said,

An Eighth Amendment claim of this nature requires proof of two elements to establish deprivation of a constitutional right. [*Farmer*, 511 U.S.] at 834; *Brown v. N.C. Dep't of Corr.*, 612 F.3d 720, 723 (4th Cir. 2010). First, a prisoner must establish a serious deprivation of his rights in the form of a "serious or significant physical or emotional injury."[ ] *Brown*, 612 F.3d at 723; *see also De'lonta v. Johnson*, 708 F.3d 520, 525 (4th Cir. 2013). . . . The second element … requires that a plaintiff show that the prison official allegedly violating the plaintiff's constitutional rights had a "sufficiently culpable state of mind." *Farmer*, 511 U.S. at 834 (citation and internal quotation marks omitted). In this context, the required state of mind that must be established is a "deliberate indifference to inmate health or safety." *Id*. (citations omitted).

*Id*. at 346-347.

In order to prevail on an Eighth Amendment claim of failure to protect from violence, plaintiff must establish that defendants exhibited deliberate or callous indifference to a specific known risk of harm. *See Pressly v. Hutto*, 816 F. 2d 977, 979 (4th Cir. 1987). "Prison conditions may be restrictive and even harsh, but gratuitously allowing the beating or rape of one prisoner by another serves no legitimate penologicial objective, any more than it squares with evolving standards of decency. Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society.*" Farmer* 511 U.S. at 833-34 (citations omitted). A prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. at 837; *see also Rich v. Bruce*, 129 F. 3d 336, 339-40 (4th Cir. 1997)

Assuming, plaintiff's injuries qualify as "significant" under the first element of the *Farmer* test, the second element is more problematic.  The second element forms the core question and requires plaintiff to show that defendants had a "sufficiently culpable state of mind."  Evidence concerning "constructive notice" of a risk of harm is generally insufficient to establish deliberate indifference. *Farmer* 511 U.S. at 840-43.  Further an official's failure to ameliorate a significant risk that he "should have perceived but did not" also will not give rise to an Eighth Amendment Claim. *Farmer* 511 U.S. at 838; *Iko*, 535 F.3d 225, 251 (4th Cir. 2008). ("It is not enough that the [defendant]should have recognized" a substantial risk of harm."

There is simply no indication that any of the correctional defendants had advanced knowledge provided by plaintiff or anyone else that plaintiff was in particular danger of assault by Joyce.  Further, there is also no evidence to support plaintiff's bald allegation, refuted by the affidavits of Linn and Evans, that Linn and Evans conspired with Joyce to harm plaintiff.  The uncontradicted evidence before the court demonstrates that plaintiff suffered a spontaneous violent attack at the hands of Joyce.  Once alerted officers responded quickly and reasonably to the attack by separating the inmates, providing access to medical care for plaintiff, and investigating his claims. There is simply no evidence that officers were deliberately indifferent to a significant risk of harm. [5]

B.  Excessive Force

---

[5] To the extent plaintiff seeks a criminal prosecution of others, he has no legally protected interest in the prosecution of others. The Supreme Court said in *Linda R.S. v. Richard D*., 410 U.S. 614, 619 (1973): "[I]n American jurisprudence at least, a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *See also Sattler v. Johnson*, 857 F.2d 224, 227 (4th Cir. 1988) (a member of the public at large has no constitutional right to have a defendant criminally prosecuted); *Doe v. Mayor and City Council of Pocomoke City*, 745 F.Supp. 1137 (D. Md. 1990) (crime victims lacked standing to bring civil rights action against city officials and prosecutor based on failure to prosecute case, as duty to prosecute does not extend to any one member of the public).

Whether force used by prison officials was excessive is determined by inquiring if "force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U. S. 1, 6-7 (1992).  This court must look at the need for application of force; the relationship between that need and the amount of force applied; the extent of the injury inflicted; the extent of the threat to the safety of staff and inmates as reasonably perceived by prison officials; and any efforts made to temper the severity of the response.  *See Whitley v. Albers*, 475 U. S. 312, 321 (1986).  The absence of significant injury alone is not dispositive of a claim of excessive force.  *See Wilkens v. Gaddy*, 559 U.S. 34 (2010).  The extent of injury incurred is one factor indicative of whether or not the force used was necessary in a particular situation, but if force is applied maliciously and sadistically liability is not avoided simply because the prisoner had the good fortune to escape serious harm.  *Wilkens*, 559 U.S. at 38.

Defendants deny that plaintiff was assaulted by staff on February 21, 2014,  and no records of a use of force incident were generated.  Plaintiff, the non-moving party, must establish the existence of a genuine issue of material fact by presenting evidence on which a fact-finder could  reasonably find in his favor.  Plaintiff has failed to submit any evidence to support his claim, or to put the material fact of this case—the use of force--in dispute.  *See generally Gray v. Spillman*, 925 F.2d 90 (4th Cir. 1991).  Although the non-moving party may rely upon a verified complaint when allegations therein are based on personal knowledge, *see Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991), plaintiff's complaint is not verified.   Accordingly, defendants are entitled to summary judgment on this claim.

 C. Harassment

Verbal abuse of inmates by guards, without more, states no claim of assault. *See Collins v. Cundy*, 603 F.2d 825 (10th Cir. 1979); *see also Carter v. Morris*, 164 F. 3d 215, 219, fn. 3 (4th Cir. 1999) (rejecting use of racial epithets as a basis for constitutional claim).  However, a threat of harm combined with action apparently designed to carry out threat may state Eighth Amendment claim. *See Hudspeth v. Figgins*, 584 F.2d 1345 (4th Cir. 1978).  The threats alleged in this case are not condoned by this court, but falls short of acts forbidden by the Fourth, the Fourteenth, or the Eighth Amendments.  *See Pink v. Lester*, 52 F.3d 73, 75 (1995) ("[N]ot all undesirable behavior by state actors is unconstitutional.").  Moreover, defendants deny they threatened or verbally abused plaintiff as alleged, and he has failed to submit any evidence to support his claim, or to put the material fact of this case regarding verbal abuse and threats in dispute.  *See generally Gray v. Spillman*, 925 F.2d 90 (4th Cir. 1991).

D.     Conditions

Conditions which "deprive inmates of the minimal civilized measure of life's necessities" may amount to cruel and unusual punishment.  *Rhodes v. Chapman*, 452 U. S. 337, 347 (1981).  However, conditions which are merely restrictive or even harsh, "are part of the penalty that criminal offenders pay for their offenses against society."  *Id*.

> In order to establish the imposition of cruel and unusual punishment, a prisoner must prove two elements - that 'the deprivation of [a] basic human need was *objectively* sufficiently serious,' and that '*subjectively* the officials acted with a sufficiently culpable state of mind.'

*Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (emphasis in original; citation omitted).  "These requirements spring from the text of the amendment itself; absent intentionality, a condition imposed on an inmate cannot properly be called "punishment," and absent severity,

such punishment cannot be called "cruel and unusual." *Iko*, 535 at 238 citing *Wilson v. Seiter*, 501 U.S. 294, 298-300 (1991).

To establish a sufficiently culpable state of mind, there must be evidence that a known excessive risk of harm to the inmate's health or safety was disregarded. *See Wilson*, 501 U. S. at 298.  In other words, "the test is whether the guards know the plaintiff inmate faces a serious danger to his safety and they could avert the danger easily yet they fail to do so." *Brown v. North Carolina Dept. of Corrections,* 612 F.3d 720, 723 (4th Cir. 2010), quoting *Case v. Ahitow*, 301 F.3d 605, 607 (7th Cir.2002).  Conduct is not actionable under the Eighth Amendment unless it transgresses bright lines of clearly-established pre-existing law.  *See Maciariello v. Sumner*, 973 F. 2d 295, 298 (4th Cir. 1992).

The objective prong of a conditions claim requires proof of an injury.  "[T]o withstand summary judgment on an Eighth Amendment challenge to prison conditions a plaintiff must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions."  *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir. 1993).  "Only extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim regarding conditions of confinement." *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003).  Demonstration of an extreme deprivation proscribed by the Eighth Amendment requires proof of a serious or significant physical or emotional injury resulting from the challenged conditions.  *See Odom v. South Carolina Dept. of Corrections*, 349 F. 3d 765, 770 (4th Cir. 2003).

In the instant case there was no bright line crossed by defendants in placing plaintiff in a contingency cell after he refused housing and was uncooperative during a strip search. The conditions as described by plaintiff were not so severe that defendants could be charged with

"fair warning that their conduct was unconstitutional." *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F. 3d 2929, 313 (4th Cir. 2006).

Plaintiff was housed in the contingency cell from January 3-5, 2014.  Payton avers that neither he nor any of his staff denied meals to inmates housed on staff alert. *Id*., Ex. 4 & 10.  The discomforts experienced by plaintiff in the contingency cell were restrictive and harsh, but did not impose cruel and unusual punishment on plaintiff.  This conclusion is supported by the absence of proof of significant, serious physical or psychological injury resulting from plaintiff's temporary stay in the contingency cell. As such defendants are entitled to summary judgment on plaintiff's conditions of confinement claim.

E.      Conspiracy

To establish a civil conspiracy under § 1983,  plaintiff must present evidence that defendants acted jointly in concert and that some overt act was done in furtherance of the conspiracy, which resulted in deprivation of a constitutional right. *See Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir.1996).  An essential element for a claim of conspiracy to deprive  plaintiff of a constitutional right, is an agreement to do so among the alleged co-conspirators. *See Ballinger v. N.C. Agric. Extension Serv*., 815 F.2d 1001, 1006-07 (4th Cir.1987). Without an agreement, the independent acts of two or more wrongdoers do not amount to a conspiracy. *See Murdaugh Volkswagon v. First Nat'l Bank*, 639 F.2d 1073, 1075-76 (4th Cir.1981). Plaintiff must allege facts establishing that defendants shared a "unity of purpose or a common design" to injure him.  *Am. Tobacco Co. v. United St*ates, 328 U.S. 781, 809-10 (1946).  Plaintiff has supplied no evidence to support his claims that correctional staff conspired with other inmates and medical staff to harm plaintiff.  Defendants deny the existence of any conspiracy or any effort to harm plaintiff. ECF 27, Exs.6, 7, 8, 9, 10.  Conclusory allegations of

15

conspiracy, such as are contained in plaintiff's complaint, are insufficient to state a claim. *See*

*Boddie v. Schneider*, 105 F.3d 857, 862 (2d. Cir. 1997) (unsupported claim of conspiracy to issue

false disciplinary reports fails to state a claim); *see also Manis v. Sterling*, 862 F.2d 679, 681 (8th

Cir. 1988) ("allegations of conspiracy must be pled with sufficient specificity and factual support

to suggest a 'meeting of the minds'").  As such, plaintiff's conspiracy claim is dismissed.

C.  Transfer

To the extent plaintiff seeks his transfer from the Cumberland Region (ECF No. 1), he

has no constitutional right to be housed in a particular facility. "[G]iven a valid conviction, the

criminal defendant has been constitutionally deprived of his liberty to the extent that the State

may confine him and subject him to the rules of its prison system so long as the conditions of

confinement do not otherwise violate the Constitution."  *Meachum v. Fano*, 427 U.S. 215, 224

(1976); s*ee also Sandin v. Conner*, 515 U.S. 472 (1995) (requiring an atypical and significant

hardship as prerequisite to creation of a constitutionally protected liberty interest).  Plaintiff does

not have a right to be housed in a particular prison or participate in a particular program, and

these allegations must be dismissed. *See Olim v. Wakinekona*, 461 U.S. 238, 244-45 (1983).

D.  Medical Claim

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue

of  its guarantee against cruel and unusual punishment.  *Gregg v. Georgia*, 428 U.S. 153, 173

(1976).  "Scrutiny under the Eighth Amendment is not limited to those punishments authorized

by statute and imposed by a criminal judgment." *De'Lonta*, 330 F. 3d at 633 citing *Wilson v.*

*Seiter*, 501 U.S.294, 297 (1991).   In order to state an Eighth Amendment claim for denial of

medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act

amounted to deliberate indifference to a serious medical need.  *See Estelle v. Gamble*, 429 U.S.

97, 106 (1976). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

As noted above, objectively, the medical condition at issue must be serious. *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care). Proof of an objectively serious medical condition, however, does not end the inquiry. The subjective component requires "subjective recklessness" in the face of the serious medical condition. *Farmer*, 511 U.S. at 839– 40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F. 3d 336, 340 n. 2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virginia Beach Correctional Center*, 58 F. 3d 101, 105 (4th Cir. 1995), quoting *Farmer,* 511 U.S. at 844. If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *Brown v. Harris,* 240 F. 3d 383, 390 (2001) citing *Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken).

"[A]ny negligence or malpractice on the part of . . . doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference". *Johnson v. Quinones* 145 F. 3d

164, 166 (4th Cir. 1998).  Without evidence that a doctor linked presence of symptoms with a diagnosis of a serious medical condition, the subjective knowledge required for Eighth Amendment liability is not present.  *Id*. at 169 (actions inconsistent with an effort to hide a serious medical condition refute presence of doctor's subjective knowledge).  Mere disagreement with a prescribed course of treatment is insufficient to establish an Eighth Amendment claim of deliberate indifference.  *See Russell v. Sheffer*, 528 F. 2d 318, 319 (4th Cir. 1975).

Plaintiff's medical records reveal that he suffers from backache, asthma, hypertension, epilepsy, hyperlipidemia, chronic pain, hypertension, and dermatofibrosarcoma protuberans, which medical defendants describe as a soft tissue tumor with intermediate to low grade malignancy. ECF No. 17, Ex. 2.  Plaintiff's medical records also show a mental health history significant for Axis II personality traits and manipulative behaviors. Additionally, plaintiff has a history of noncompliance with his medication regimen, fails to attend scheduled appointmenst, and displays  aggressive and hostile behavior toward medical staff. *Id*.

On July 12, 2013, while housed at WCI, plaintiff was seen by Dr. Yahya due to complaints of back pain. *Id., Ex 1, pp. 1-2.  Plaintiff reported that his back hurt when he bent forward and medication previously prescribed did not alleviate the pain. Dr. Yahya began plaintiff on baclofen, a muscle relaxer, and Tylenol-codeine No. 3, a pain medication. He was advised to follow up in seven days if did not show improvement.

Dr. Joubert evaluated plaintiff on July 31, 2013. *Id., pp. 3-4. Joubert noted that plaintiff's attention was diverted when correctional staff asked about plaintiff's self-professed need to be pushed in wheelchair because he could not ambulate. *Id.* Joubert noted that plaintiff became irate and left the room when she refused to confirm, at plaintiff's insistence, his need to be pushed in a wheelchair. *Id*.

Plaintiff as seen by Mariama Coker, R.N. on September 15, 2013, after he was involved in an altercation. Plaintiff reported pain in his head and back, and stated his belief that his back was re-injured during the altercation. *Id.*, p. 5.

On September 16, 2013, plaintiff was transferred to Laurel Regional Hospital after suffering a seizure. Staff at the hospital noted that plaintiff ambulated upon arrival with a steady gait. *Id.*, pp. 209-236. Plaintiff was returned to WCI infirmary the following day. While at Laurel Regional Hospital, CT scans of plaintiff's cervical and thoracic spine were done along with a number of laboratory tests. The CT scans were negative for acute pathology. He was provided Percocet for pain relief and directed to follow up with a neurologist as soon as possible. *Id.*

On September 18, 2013, plaintiff was seen by Dr. Barrerra during infirmary rounds. *Id.*, p. 12-13. Barrera noted that plaintiff's anti-seizure medication levels were very low when tested at the hospital. Plaintiff advised that he had not taken his medication due to an alleged allergy. *Id.* Later that day, plaintiff was seen by Kimberly Martin. R.N. Plaintiff advised Martin that he had a tumor on his back and the tumor was likely causing his lower extremity weakness. No neurological deficits were found upon assessment but bilateral hand and leg weakness was observed. Martin noted "scarring/growth" on plaintiff's upper back. Plaintiff was able to stand in order to transfer to a wheelchair and able to complete self-care activities. *Id.*

The following day, plaintiff was seen by Karen Meyers, R.N. Plaintiff advised Meyers he was in the infirmary due to back pain which he rated a fourteen out of ten. Meyers noted that plaintiff was out of bed with no signs or symptoms of severe pain. Plaintiff later advised Meyers that he had also had a seizure. Plaintiff was able to move all extremities; however, weakness was noted on the lower extremities. *Id.*, p. 16-17.

Later that day plaintiff was seen by Dr. Ottey, who noted plaintiff was in the infirmary due to experiencing a seizure and reported back pain at the site of a previous tumor resection which he underwent in 2005. *Id*., pp. 19-20, 205.   Ottey examined plaintiff and noted that plaintiff's spine showed signs of tenderness to the mid to upper back. Ottey discharged plaintiff to special housing, noting that plaintiff had been noncompliant with his medication, which was the likely cause of the seizure. *Id*.

On September 25, 2013, plaintiff was seen by Dr. Joubert.  Plaintiff inquired, when the sarcoma would be biopsied.  Joubert advised plaintiff that since he did not attend his last scheduled oncology appointment it had to be rescheduled and she did not know when that would occur. Plaintiff's back and spine, on assessment were positive for tenderness with a pencil erasure shared scar noted. Joubert scheduled a neurological chronic care follow for three months. *Id.,* pp. 25-27.

On September 30, 2013, plaintiff was seen by Delores Adam, R.N. due to his complaints of chest discomfort. *Id*. pp. 28-30.   Plaintiff reported that he had cancer which Dr. Joubert thought was spreading. He stated that the pain began in his neck and travelled to his groin. He was agitated that his examination did not extend beyond his complaint of chest pain, which was the basis of the visit. Plaintiff asked when he would receive a biopsy. *Id*.

Plaintiff was seen by Dr. Joubert on October 2, 2013, and his back assessed. *Id*., p. 31. Joubert noted no change including the size of the scar. She noted plaintiff had failed to make himself available for re-biopsy and he was advised that if he refused a further off-site visit for his back he would not have future evaluations pursued by medical staff. *Id.*

On October 14, 2013, plaintiff was again seen by Dr. Joubert who noted plaintiff ambulated using a plastic chair as a walker.  Joubert noted this likely caused back pain as it

required a great deal of forward bending. Joubert advised plaintiff she would email the scheduler regarding plaintiff's biopsy. She further determined plaintiff's current pain management regimen was adequate. *Id.*, p.p. 25-38. On October 25, 2013, a consult for general surgery was approved. *Id.*, p. 39.

On November 5, 2013, plaintiff expressed concern to Qinta Lum, P.A. regarding the time it would take him to be transported to the biopsy, indicating his belief that his pain medication was inadequate. *Id.*, pp. 42-44. Lum placed a referral for plaintiff's medication concerns to be discussed during a collegial meeting. *Id.*

Plaintiff was seen on November 15, 2013, by Dr. Joubert due to his complaints of back pain and lower extremity weakness. *Id.* pp. 45-46. Plaintiff's spine was negative for tenderness. Joubert attempted to reassure plaintiff and advised that the biopsy consult had been approved. Plaintiff became angry and was escorted from the exam room. Joubert referred plaintiff to a general surgery provider for removal of the back lesion. *Id.*

Plaintiff was seen by Peggy Mahler, R.N.P. on December 10, 2013. *Id.* at pp. 47-51. Plaintiff reported upper back pain and requested he be provided Tylenol No. 3. It was noted that plaintiff was seen by Dr. Stasko on December 2, 2013, who recommended a re-excisional skin biopsy of the lesion on plaintiff's back. Mahler ordered a follow up with Dr. Joubert for a surgical consult in one month and placed a request for a surgical consultation for a re-excisional biopsy for plaintiff's sarcoma, Mahler also placed a non-formulary drug request for Tramadol. *Id.*

Plaintiff was again seen by Mahler on December 18, 2013, who noted that plaintiff's reexcisional skin biopsy was approved on December 10, 2013, and that it was in the process of

being scheduled. *Id*., pp. 52-57. Mahler referred plaintiff to a provider in six weeks for a follow-up surgical consultation for plaintiffs re-excision. *Id.*

On December 20, 2013, plaintiff was seen by Dr. Joubert. *Id*.,pp. 58-59. He complained of testicular and back pain, which he felt were related to the possible spread of cancer. Dr. Joubert  advised plaintiff that she would check on his surgical referral. *Id*. Plaintiff's surgical consultation was approved on December 23, 2013 and he was advised of same on December 25, 2015. *Id*., p. 60.

On January 4, 2014, plaintiff was seen by Nurse Opel in the contingency cell. Custody advised Opel that plaintiff was being returned to his cell when he became combative and refused housing. Custody advised Opel that plaintiff had been up all night screaming. Plaintiff stopped Opel while on morning segregation rounds complaining of chest discomfort. Plaintiff did not appear to be in any distress and was standing without difficulty. He requested to be removed from his cell so that his vital signs could be checked. Custody advised Opel that it would be dangerous to remove plaintiff from his cell and he should only be removed in case of emergency. Opel advised plaintiff she would not release him from the cell and plaintiff screamed, "Fuck you you bitch! I am going to writ you up you fucking bitch! Just wait." *Id*., p. 61. Plaintiff was returned to his normal cell the following day with no visible injuries and voicing no complaints of injury. *Id*., p. 62.

Plaintiff was seen by Dr. Joubert for a preoperative history and physical on January 10, 2014. *Id*, pp, 65-67. On January 16, 2014, the re-excision of plaintiff's sarcoma was performed by Dr. Stasko. *Id*., p. 205. That same day, plaintiff returned to the WCI infirmary. *Id*., p. 68. Dr. Barrera renewed plaintiff's medications. *Id*. Plaintiff was seen by Jamie Ravenscroft, R.N. in the infirmary. *Id*.,  pp. 69-70. Plaintiff reported he was not in pain at the time. *Id*. He showed no signs or symptoms of distress and voiced no complaints. *Id*. Later that day he was seen by

Patricia Knotts, R.N.  *Id*., p. 72. Plaintiff was observed to be sitting up and reading a magazine. He was pleasant and cooperative with his care and  able to perform all activities of daily life without assistance. *Id*.

The following day, plaintiff was discharged from the infirmary to general population by Dr. Barrera. *Id*., 73-776. Dr. Barrera ordered that plaintiff have his dressing changed daily and return for follow-up with a provider in one week. *Id*.

On January 21, 2014, plaintiff was seen by Nurse Practitioner Mahler. *Id*., pp. 78-81. He complained of pain at the biopsy site and inquired as to his follow up with Dr. Stasko. He was advised that Dr. Stasko had not dictated his notes yet but once this was done the notes would be sent to WCI. Plaintiff's sutures were intact with no erythema, discharge, or bleeding observed. Plaintiff's medication were reviewed. Mahler placed a referral for plaintiff to see a provider in one week and placed a request to renew plaintiff's Tramadol. *Id*.

On January 24, 2014, plaintiff was seen by Dr. Joubert for a scheduled provider visit. *Id*., pp. 83- 84. It was determined that plaintiff's sutures were not ready to be removed yet, and were scheduled to be removed in three days. *Id*. During the visit, plaintiff told Joubert that he had been raped twice. *Id*. Plaintiff stated that he was vulnerable after his surgical procedure and his cellmate took advantage of him. *Id*. Blood was- observed around Plaintiff's anal area and in plaintiff's underwear. Id. Plaintiff was advised to not shower, brush his teeth or wash, and was transported to the emergency department at the Western Maryland Regional Medical Center for post sexual assault evaluation, treatment, and forensics. *Id*. Dr. Joubert notified Dr. Ottey, Dr. Ron Paul, the emergency department director, the State Medical Director, the Prison Rape Elimination Act (PREA) Coordinator, Dental, the Site Assistant Director of Nursing, the Site Director of Nursing, RM, Behavioral Health, and the warden of plaintiff's allegations. *Id*.  Later

that day, plaintiff was seen by Dr. Ottey in the infirmary. He was diagnosed as having suffered a sexual assault and ordered on bed rest with bathroom privileges. *Id*., pp. 86-88.

The following day, plaintiff was seen in the infirmary by Nurse Knotts. Plaintiff requested his medication and appeared anxious due to his recent sexual assault. *Id*., p. 89. Nurse Ravenscroft also saw plaintiff that day and noted plaintiff ambulated in a wheelchair for long distance independently. Plaintiff stated his abdominal and rectal pain was eight out of  ten but showed no signs or symptoms of distress. *Id*., p. 90. Later that day he was seen again by Ottey. Plaintiff reported back, abdominal and rectal pain but denied rectal bleeding. Ottey referred plaintiff to behavioral health for evaluation and treatment. *Id*. pp. 91-94. Plaintiff advised Michelle Schultz, R.N. that he did not want to be seen by Behavioral Health but was advised that pursuant to protocol he must speak with Behavioral Health before returning to his normal housing unit. *Id*., p. 96.  Ottey noted on January 26, 2014, that plaintiff would be seen by Behavioral Health the next day. *Id*., pp. 96-97.

Plaintiff was cleared by the psychologist on January 27, 2014, and discharged from the infirmary into general population that same day  by Dr. Barrera. *Id*., p. 98. Later that day, plaintiff became verbally abusive with correctional staff and Nurse Adams during plaintiff's scheduled suture removal such that the suture removal had to be rescheduled. *Id*., pp. 101, 104.

On February 7, 2014, plaintiff was seen by Dr. Barrera for a scheduled provider visit. *Id*., pp. 106-107. Dr. Barrera inquired about the sexual assault and noted that plaintiff seemed to not mind and instead complained of back pain. *Id*. Barrera noted that during plaintiff's recent infirmary admission he  ambulated without difficulty and offered no complaints of back pain. *Id*. In contrast it was noted that plaintiff now walked with the assistance of a chair. *Id*. Barrera increased plaintiff's Baclofen dosage. *Id*.

On February 11, 2014, plaintiff was seen by Beverly McLaughlin, R.N.P.   He complained mostly of pain and ambulated with a chair for balance. *Id*., pp. 110-15. It was noted that correctional officers previously took away plaintiff's walker due to safety concerns after plaintiff assaulted his cellmate with it. *Id*. Plaintiff reported being in constant

pain from his surgical procedure and requested an increased dosage of Ultram. *Id*. Plaintiff denied the need to be admitted to the infirmary. *Id*. McLaughlin placed a non-formulary drug request to increase the Ultram dosage. *Id*.

On February 12, 2014, Mahler noted plaintiff's biopsy was positive for neoplasm, and that the tumor was to be stained to assist with a differential diagnosis of the tumor. *Id*., pp. 115-16. A consultation request was placed with oncology and a provider visit was scheduled for one month to follow the oncology evaluation. *Id*.

On February 17, 2014, plaintiff was seen by Nurse Opel due to his complaints of back pain. *Id*., p. 117. Plaintiff stated that it was difficult for him to sit for an extended period of time; however, custody reported that he sat in his chair at his door all night with no sign of difficulty. *Id*. Opel noted that plaintiff recently received an increase in his pain medications and he was advised to wait to see how changed dosage worked. *Id*.

On February 18, 2014, plaintiff was seen by McLaughlin who observed plaintiff slowly walking with a chair as a walker. *Id*., pp. 118-120.  Plaintiff stated  he could no longer care for himself in his cell, and that he urinated and defecated on himself due to pain and incontinence. *Id*. He was offered adult diapers, but declined. *Id*. McLaughlin  noted that a consult with oncology was recently placed. *Id*.

On February 26, 2014, plaintiff was seen by Mahler due to his continued complaints of pain.  *Id*.,  pp. 121-23.He reported he was assaulted by correctional officers five days earlier. *Id*.

Plaintiff reported occasionally urinating  and defecating on himself and agreed to use adult diapers. *Id*. An x-ray of plaintiff's spine as well as physical therapy were  ordered.  Additionally, he was given an order for bottom-bunk status for three months. *Id*.

Plaintiff refused to be seen by the doctor  on  March 11, 2014, it his appointment was rescheduled for one month later. *Id*., p. 124-25. He was seen the following day by McLaughlin. Plaintiff complained of fatigue, weakness, and chronic pain. *Id*., pp. 126-29.  McLaughlin noted that plaintiff's follow-up visit with oncology was approved. *Id*.

On March 21, 2014, plaintiff was seen by Mahler for a scheduled provider visit. *Id*.,  pp. 130-34. Plaintiff again voiced complaints of fatigue, weakness and chronic pain. *Id*. He walked with a chair, but was able to stand up straight on the scale. *Id*. He reported that his pain medication was ineffective. *Id*. Mahler  noted that plaintiff's spinal x-rays were unremarkable, *Id.* An x-ray of plaintiff's lumbar spine was ordered and his dosage of Mobic increased. *Id*.

On March 26, 2014, plaintiff was evaluated by McLaughlin who observed him walking with a plastic chair. *Id*., pp. 135-39.   Plaintiff complained that his pain medication was ineffective and he was again  advised that he needed to give his pain medication increase time to work. *Id.*

On April 7, 2014, plaintiff was seen by Mahler. He reported lower back pain without incontinence. *Id*., pp.  140-44. He did not complain of testicular pain.  He  advised that another nurse told him he would be provided a walker.[6] Plaintiff's x-rays were unremarkable. *Id*.

On April 9, 2014, plaintiff was examined by Barrera. *Id*., pp. 145-47. Plaintiff complained of sharp, non-radiating back pain and after examination,  Barrera determined to

---

[6] Medical defendants note that plaintiff's claim regarding the walker were untrue as he had previously been denied use of a walker by custody staff due to his using it as weapon.

continue plaintiff on his current plan of care. *Id.* Plaintiff refused his next scheduled visit with Barrera on April 28, 2014. *Id.*, p. 153.

On May 8, 2014, plaintiff was seen by Maria Lewis, L.P.N., due to reports of him lying on the floor. *Id.*, p. 154. Upon arrival at his cell, plaintiff was observed able to sit up and showed no signs or symptoms of distress. *Id.* Plaintiff stated that he was being denied medical care and requested to see a provider for pain management. *Id.* He was instructed to place a sick call for such a request. *Id.*

On May 9, 2014, plaintiff refused his oncology follow-up visit with Mahler. *Id.*, pp. 156-57. On May 12, 2013, plaintiff refused to have his lab work collected. *Id.*, p. 20. Later that day, plaintiff was seen by Christa Martin, R.N., who observed plaintiff walking upright and carrying a chair in front of himself with minimal touch-down of the chair to the floor. *Id.*, pp. 161-62. Plaintiff requested an increase of his medication and was advised that the pharmacist just reviewed plaintiff's seventeen medications and one pain medication had recently been increased. *Id.* Martin further noted plaintiff's refused to attend his oncology appointment earlier in the month. *Id.* Martin also noted that when plaintiff's request for an ambulance transport to his oncology appointment was refused because he was able to sit without difficulty, the appointment ended and plaintiff walked upright back to his cell carrying his chair. *Id.*

On June 11, 2014, plaintiff was examined by Qamar Zaman, M.D., at the Schwab Family Cancer Center for his scheduled oncology follow-up consultation. *Id.*, pp. 205-208. Dr. Zaman noted plaintiff's long history of sarcoma, which was initially excised in 2005, but which recurred and was gradually monitored and excised again by Dr. Stasko on January 16, 2014. *Id.* Upon completion of his evaluation, Dr. Zaman recommended plaintiff's sarcoma be re-excised at the margin. *Id.* He also recommended CT scans of plaintiff's chest, abdomen, and pelvis as well as

an MRI of plaintiff's thoracic and lumbar spine due to plaintiff's complaints of pain in those areas. *Id.* Zaman noted that plaintiff requested a fentanyl patch, but Zaman determined that plaintiff's medical physician could determine how to manage plaintiff's pain. *Id.*

On June 12, 2014, plaintiff reported a sexual assault occurring from the previous night. *Id.* at pp. 163-65. Plaintiff reported being punched in the jaw, knocked out, and waking up with blood in his rectum. *Id.* Plaintiff stated he had not showered, was wearing the same clothes, and denied oral sexual activity. *Id.*  He refused prophylaxis and STI testing. *Id.* He was transported to the emergency department for further testing and evaluation. *Id.* Plaintiff was observed later that day by Karen Stratton, R.N. sitting in a chair without difficulty. *Id.*

After return from the emergency room that day, plaintiff was admitted to the WCI infirmary. *Id.*, pp. 172-73. He demanded he be given a chair to assist with his ambulation and stated he needed the chair so he could scoot. *Id.* He stated he was unable to walk due to cancer. Custody advised that he was observed ambulating independently without difficulty.  His current care plan was continued. *Id..*  He was discharged from the infirmary to general population on June 13, 2014. *Id.* at pp. 176-77. Plaintiff's discharge summary noted that no evidence of penetration or sexual assault was observed. *Id.* On June 14, 2014, a PREA incident retrospective was completed which noted that upon examination plaintiff showed no objective signs of assault. He had a full range of motion in his jaw and no fractured teeth. *Id.*, pp. 179-180.

On June 17, 2014, plaintiff was seen by Mahler to review Dr. Zaman's oncology consult. *Id.*, p. 181-82.  As noted, supra Zaman recommended re-excision of the margin, CT scans of plaintiff's chest, abdomen, and pelvis, and MRIs of plaintiff's cervical and lumbar spine and plaintiff was to  be seen by Dr. Stasko for re-evaluation once the tests had been completed. *Id.* Plaintiff stated that Zaman ordered a fentanyl patch for plaintiff: however Zaman's note stated,

"the [Plaintiff] is requesting fentanyl patch. This can be evaluated by the medical physician." *Id*. Mahler advised plaintiff he would not be receiving a fentanyl patch and plaintiff raised no other concerns. *Id*.

On June 17, 2014, Mahler placed a consult for Dr. Stasko "for re-excision of the margin due to pathology report showing neoplasm reaches medial tip and extensively involves almost all of the inferior margin." *Id*.,pp. 183-84. That same day, plaintiff was seen by S. Weber, M.S., L.C.P.C., N.C.C, for a behavioral health visit. *Id*., pp. 187-89. Mr. Weber stated that Plaintiff was manipulative, showed poor judgment, and presented with significant Axis II characteristics. *Id*.

On June 18, 2014, plaintiff, complaining of uncontrolled pain, was seen by McLaughlin. *Id*., 190-94. Plaintiff requested a fentanyl patch, but was advised that a fentanyl patch was not an option at WCI. *Id*.  Plaintiff agreed to McLaughlin's offer to increase his Gabapentin. *Id*.

Plaintiff was transferred to North Branch Correctional Institution ("NBCI") on June 20, 2014. *Id*., pp. 197-204.  At NBCI, plaintiff continues to be evaluated by prison medical staff as a chronic care patient. *Id*., Ex. 2.

As demonstrated by plaintiff's extensive medical recommend, he simply disagrees with the course of treatment he has been provided.  Contrary to his assertions, his cancer is being treated. He has been provided diagnostic testing and undergone surgery.  Efforts have been continuously made to manage plaintiff's pain.  Mere disagreement with a course of treatment does not provide the framework for a federal civil rights complaint. *See Russell v. Sheffer*, 528 F.2d 318 (4th Cir. 1975). "[A]ny negligence or malpractice on the part of . . . doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference". *Johnson v. Quinones* 145 F. 3d 164, 166 (4th Cir. 1998).  Without evidence that a doctor linked presence of

symptoms with a diagnosis of a serious medical condition, the subjective knowledge required for Eighth Amendment liability is not present. *Id*. at 169 (actions inconsistent with an effort to hide a serious medical condition refute presence of doctor's subjective knowledge).

Plaintiff, the non-moving party, must establish the existence of a genuine issue of material fact by presenting evidence on which a fact-finder could reasonably find in his favor. Plaintiff has failed to submit any evidence to support his claim that the medical defendants provided constitutionally inadequate medical care. The medical defendants efforts to address his medical needs and provide appropriate treatment. In light of the foregoing the medical defendants are entitled to summary judgment.

A separate order follows.

  February 19, 2015                                           /s/
Date                                                    J. Frederick Metz
                                                        United States District Judge